IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANTHONY CHESSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-948-WKW |
| | ) | [WO] |
| MONTGOMERY COMMUNITY | ) | |
| ACTION COMMITTEE AND | ) | |
| COMMUNITY DEVELOPMENT | ) | |
| CORPORATION, INC. d/b/a | ) | |
| MONTGOMERY COMMUNITY | ) | |
| ACTION AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is a motion for summary judgment (Doc. # 27) filed by

Defendant Montgomery Community Action Agency ("MCAA"). Plaintiff Anthony

Chesser filed a response in opposition to the motion (Doc. # 34), to which MCAA

replied (Doc. # 36). After careful review of the arguments, evidence in the record,

and relevant law, the court finds that MCAA's motion for summary judgment is due

to be granted.

## I. JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1343, and 1367. Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*; Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, the movant can assert, without citing to the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs*., 276 F.3d 1275, 1279 (11th Cir. 2001).

2

## III.  BACKGROUND

### A.    Facts

MCAA is a 501(c)(3) non-profit that provides social services to economically disadvantaged members of Montgomery County, Alabama.  MCAA administers two primary initiatives – a Head Start Program that provides pre-school and early childhood educational opportunities for children under the age of five and a Community Services Program that provides food, energy, and housing assistance to qualifying individuals.  Mr. Chesser, a white male, has been employed by MCAA since 1994.

### 1.    *Mr. Chesser's Roles at MCAA*

In his twenty years with MCAA, Mr. Chesser has held four different positions. When he was first hired, Mr. Chesser filled a generic "utility" role that required him to perform various delivery and repair tasks.  After approximately five years in that position, Mr. Chesser transitioned and became one of MCAA's disability bus drivers.  He drove an MCAA bus for a number of years before moving to fill a newly created MCAA position – interdepartmental mail courier.[1]  When he became the mail courier, Mr. Chesser received a pay increase.

---

[1] Mr. Chesser speculates in his deposition that he was transitioned into the role of mail courier as a way to appease him after he did not receive a promotion for which he had indicated

Mr. Chesser worked as MCAA's sole mail courier for approximately five years until August of 2010 when MCAA terminated the position, transitioning Mr. Chesser into a role within MCAA's Support Services Department.[2]  Since being transitioned into the Support Services Department, Mr. Chesser has acted as MCAA's supply coordinator for the last four years.  He remains in the position, and has been supervised by Support Operations Manager Patrick Standberry for the entirety of his time in the role.[3]

As the supply coordinator, Mr. Chesser is tasked with "work[ing] closely with program staff to identify materials, products, and vendors to meet [program] support needs."  (Doc. # 28, Ex. A-1.)  The supply coordinator job description specifically makes him responsible for a number of administrative tasks, including "inventory control and management," the production of requested printouts and reports, the development of "information systems and data records to ensure accurate and prompt response to supply requesters," and the monitoring of supply usage rates for delivery purposes.  (Doc. # 28, Ex. A-1).  The job description also notes that an employee must be able to lift fifty pounds to be qualified to fill the position.

interest.  Neither Mr. Chesser's complaint nor his opposition to MCAA's motion for summary judgment discusses this non-promotion, however.

[2] With the advent of internal networks, MCAA believed it no longer necessary to devote a position solely to the transportation of interdepartmental mail.

[3] MCAA has four other coordinator positions – nutrition coordinator, disability coordinator, electronics coordinator, and property coordinator – each of which is held by a black employee.

### 2.    Mr. Chesser's Physical Condition

On August 31, 2004, while riding in an MCAA vehicle for work-related purposes, Mr. Chesser was in an automobile accident.  During the accident, he suffered injuries to his back, neck, and foot.  Mr. Chesser asserts that these injuries resulted in him being continuously disabled.  In his deposition testimony, Mr. Chesser explained that the injuries did not "really hinder" his ability to successfully perform in either of his prior positions with MCAA – disability bus driver or interdepartmental mail courier.  (Doc. # 28-2, at 44).  He did note, however, that he provided MCAA with a letter from his family doctor, Dr. Sanchez, on September 1, 2009, informing the organization that Mr. Chesser was unable to stand for more than fifteen to thirty minutes at a time due to pain from ruptured discs in his back.[4]

It was approximately twelve months after providing MCAA with his first letter from Dr. Sanchez that Mr. Chesser became MCAA's supply coordinator.  Quickly after beginning in his new role, Mr. Chesser filed an internal complaint with MCAA regarding how Mr. Standberry handled the loading of a truck.  In his complaint, Mr. Chesser informed MCAA that Mr. Standberry had called him and asked him to help one of MCAA's labor-ready employees unload and load a truck.  Mr. Chesser implied that Mr. Standberry already knew of his back injuries and

---

[4] Mr. Chesser noted that he provided an initial doctor's letter following the automobile accident. He also explained that he could not recall why he requested and later submitted the September 1, 2009 doctor's letter.

should not have asked him to perform such a task.  Second, he noted that when he reminded Mr. Standberry of his previously injured back, Mr. Standberry merely replied that "maybe this is not the job for you."  (Doc. # 28-5.)  Lastly, he complained that the labor-ready employee failed to aid in the loading and unloading of the truck, leaving him to perform the majority of the task himself and "aggravate[] [his] previous injury."  (Doc. # 28-5.)  He concluded his letter by requesting that he be removed from the supervision of Mr. Standberry.

On September 23, 2010, the Director of MCAA's Head Start Program, Dennis Johnson, responded to Mr. Chesser by letter.  In the response, Mr. Johnson informed Mr. Chesser that he would no longer have to work with the specific labor-ready employee that was involved in the incident, but that Mr. Standberry would remain his supervisor and continue to exercise "full authority of his position for the efficient, effective, and safe operation of the support operations division."  (Doc. # 28-6.)  The letter continued by noting that MCAA had conducted an investigation of the truck-loading incident, and it indicated that other employees had been helping with the loading.  In conclusion, Mr. Johnson requested that Mr. Chesser be "advised that if there are any restrictions upon your ability to perform essential functions of the job, please contact [him] for further evaluation."  (Doc. # 28-6.)

In response, on September 28, 2010, Mr. Chesser provided Mr. Johnson with a brief letter from Dr. Sanchez.  The letter stated that Mr. Chesser "has severe

6

physical limitations due to Chronic Lower Back Pain (secondary to injury caused by motor vehicle accident), Right Knee Pain, Left Ankle/Foot Paint and Neuropathy." (Doc. # 28-3.)  It went on to note that Mr. Chesser "is unable to stand, sit[,] or walk for extended periods of time, lift anything over 10 pounds, push, pull, kneel, climb, stoop, bend, crouch[,] or crawl."  (Doc. # 28-3.)  It concluded by explaining that Dr. Sanchez had recommended back surgery, but that Mr. Chesser had chosen not to open himself up to the risk and instead opted for medications that "do not impair his mental capabilities, but do cause further physical limitations."  (Doc. # 28-3.)

Mr. Chesser then worked without further incident regarding his physical condition until December 14, 2011, when he was involved in a second work-related automobile accident.[5]  Mr. Chesser's original injuries were exacerbated by this second accident.  As a result, Mr. Chesser began asking for help when performing work he felt was beyond his physical abilities.  Specifically, on February 9, 2012, when responding to an internal memorandum from Mr. Standberry asking that he

---

[5] While Mr. Chesser did not file any complaints or request any meetings regarding his physical limitations from September 28, 2010 to December 2011, he did speak with and write to R. W. Pringle and Tom Gardner during that fifteen-month period with regard to his salary, work location, and supplies.  In his September 29, 2011 letter to Mr. Gardner, Mr. Chesser explained that for months following his transition into the role of supply coordinator he was forced to work at a counter with only a pen, a legal pad, and his personal cell phone to perform his tasks. Moreover, he expressed his dissatisfaction with the fact that he had already spoken at length with Mr. Pringle regarding his lack of supplies and with the failure of MCAA to give him a raise.  When he finally did get his own office, Mr. Chesser noted that he had to clean out the office himself and purchase his own desk and printer.  Mr. Chesser took issue with these developments, noting in the letter that other coordinators had "nice offices with Agency equipment."   (Doc. # 34-11.) Ultimately, he requested a meeting with Mr. Gardner to work through his issues and to correct the "injustice."  (Doc. # 34-11.)

"conduct an inventory on all the supplies" in one of MCAA's warehouses by the end of the week, Mr. Chesser wrote that he requested help conducting the inventory because his "on the job neck injury" had "slowed [him] down immensely." (Docs. # 27-7, 27-8.) Mr. Chesser went on to note that he had a "can do attitude" and would "put forth every effort to fulfill the requests made of [him]," but that his medications make him tired and head tilting causes him dizziness and headaches. (Doc. # 27-8.) Mr. Standberry ultimately provided Mr. Chesser with a twelve-day extension in which to complete the warehouse inventory.

On February 22, 2012, Mr. Standberry sent Mr. Chesser a follow-up memorandum, noting four areas of improvement along with corrective actions that he believed Mr. Chesser could make to improve his work product. Primarily, Mr. Standberry noted general work critiques, such as delayed communications and incomplete outputs, but he also addressed Mr. Chesser's complaints of physical limitations. Specifically, he explained that he had provided Mr. Chesser with three individuals to aid in the organization of the warehouse for easier inventorying, had witnessed Mr. Chesser moving items over his weight threshold, needed Mr. Chesser to provide details of his most recent accident, doctor's visits, and medical findings, and noted that he would be "willing to provide . . . help and assistance with the physical limitations . . . that are cleared from a physician." (Doc. # 27-9.) Mr. Standberry ultimately wrote, however, that he would continue placing responsibility

on Mr. Chesser to conduct the inventories and to "report the tools that [he] needs to accomplish [his] duties beforehand."  (Doc. # 27-9.)

Mr. Chesser responded to Mr. Standberry's follow-up letter on February 27, 2012.  He addressed each of Mr. Standberry's areas of concern, noting that any delay or incomplete outputs were the result of failures on the part of those assisting him to timely provide him with the assistance required.  He also discussed Mr. Standberry's requests regarding his physical limitations by explaining that Mr. Standberry had not actually responded to his February 9, 2012 request for help and had later denied his request orally.  He went on to note that he was never made aware that three workers had been assigned to assist him, and, as a result, he performed the inventory alone. Further, he pointed out that Mr. Standberry's mention of seeing him pick up items weighing more than what his doctor recommended was evidence that Mr. Standberry already knew and had documentation of his physical limitations, leading him to question why Mr. Standberry would need any further documentation.[6]  Mr. Chesser concluded by referencing the ADA's requirement that MCCAA accommodate "employee[s] with physical impairment suffering from . . . work related injur[ies]." (Doc. # 27-10.)

---

[6] Mr. Chesser specifically noted that he had provided Mr. Standberry with a note from his physician outlining his physical impairments and limitations on multiple occasions, an accident report from his December 14, 2011 accident, a letter from his physician dated December 15, 2011, stating that he would need two weeks off as a result of the second accident, and a copy of the police accident report.

In response to Mr. Chesser's complaints regarding MCAA's compliance with the ADA, Mr. Johnson began a series of meetings with Mr. Chesser on April 2, 2012, to conduct an accommodations survey.   Mr. Standberry sat in throughout the accommodations survey while Mr. Johnson asked Mr. Chesser a variety of questions related to his ability to perform various tasks and the possible accommodations that could compensate for areas of limitation.[7]   In Mr. Johnson's affidavit accompanying MCAA's motion for summary judgment, he explained that he conducted the survey as a way to engage in an "interactive process" with Mr. Chesser to explore which job functions he needed assistance with and to evaluate possible accommodations.[8] (Doc. # 28-1.)

After the accommodations survey concluded, Mr. Johnson prepared a report that detailed his understanding of Mr. Chesser's physical limitations and requested accommodations.   The form breaks down each of the tasks Mr. Chesser would be asked to perform as a supply coordinator.   Next to each task, Mr. Johnson entered typed notes detailing whether, in light of the accommodation survey, Mr. Chesser was able to perform each task, if not, what impairment prevented the task, and

---

[7] Mr. Chesser noted that he felt the accommodation survey was more akin to an interrogation where Mr. Johnson asked him questions designed to humiliate, discriminate, and degrade.  (Doc. # 28-2, at 106.)  Specifically, Mr. Chesser takes issue with instances where Mr. Johnson asked him about his ability to read, write, see, and whether he considered himself clean.  (Doc. # 28-2, at 108.)

[8] Mr. Johnson noted that engaging in an "interactive process" is recommended by ADA regulations.  (Doc. # 28-1.)

whether an accommodation was needed to enable task completion.  For example, next to the inventory task "Count Items on Shelves" it was noted that Mr. Chesser experiences dizziness and lower back pain when counting items at an elevation. (Doc. # 28-11.)  In light of those limitations, the report stated that Mr. Chesser could not fully perform that task, but requested "help" as an accommodation.  (Doc. # 28-11.)  Mr. Johnson believed Mr. Chesser's request of help meant that Mr. Chesser wanted "someone else to complete the task."  (Doc. # 28-11.)

Mr. Johnson gave Mr. Chesser a copy of this report and asked that he review it.  Mr. Chesser examined the report, wrote notes on the portions of the report with which he disagreed, and returned the copy to Mr. Johnson on April 18, 2012, along with a typed letter.  Mr. Chesser objected to the holding of the accommodations survey and asserted that his doctor's notes should be counted as "sufficient evidence [of] what [he] can and cannot do."  (Doc. # 34-1, Ex. 16.)  He also expressed his disagreement with several portions of the report and scratched through several specific passages.  Specifically regarding several of the inventory related tasks, Mr. Chesser made notes to show his belief that some of the tasks listed – moving boxes, counting boxes, etc. – are not part of his job description and he should not be penalized for not being able to do them.[9]  (Docs. # 28-11, 28-2, at 170.)  Additionally,

---

[9] Mr. Chesser asserts that it is not his job to "move boxes" or "count items on shelves." (Doc. # 28-2, at 170.)  He contends that his job description makes him responsible for managing

11

Mr. Chesser repeatedly crossed through Mr. Johnson's notations that Mr. Chesser requested the accommodation of "help" or "someone else [to] complete the task." (Doc. # 28-11.)  In the corresponding letter, Mr. Chesser explained that he is not asking for someone else to do his job, but that he is asking "for the opportunity to enable [him] to do [his] job." (Doc. # 34-1, Ex. 16.)  During his deposition, however, Mr. Chesser explained that he wanted "[a] living breathing human being to help [him]" just like other black employees were given.[10]  (Doc. # 28-2, at 151.)

On May 24, 2012, Mr. Johnson replied by letter to Mr. Chesser's response to the accommodations survey report.  Mr. Johnson began by noting that he held the meetings because Mr. Chesser suggested that he had a disability covered by the ADA, but that Mr. Chesser had been unclear in the past as to the "identity and extent of [his] covered disability, or what reasonable accommodation [he] may be requesting." (Doc. # 28-11.)  Mr. Johnson went on to express his belief that Mr. Chesser's "vague and evasive" responses throughout the accommodations survey frustrated Mr. Johnson's attempts to determine what accommodations Mr. Chesser

---

and controlling inventory, but does not require him to actually perform inventory himself.  (Doc. # 34-1, Ex. 16.)

    [10] In his deposition, Mr. Chesser noted that he had witnessed MCAA give five black employees permanent helpers, which MCAA already had on staff.  He explained, however, that he did not know why they were given helpers and admitted that of those five individuals, only one of them had a physical impairment.  (Doc. # 28-11, at 78–80, 179.)  When describing how he would utilize a helper, he stated that he would have the helper count the inventory and then he would have managed the helper and the process.  (Doc. # 28-2, at 151.)

believed would be able to assist him in conducting inventory, an "essential function" of the supply coordinator position. (Doc. # 28-11.)  Mr. Johnson then explained that, even after reading Mr. Chesser's response to the accommodation survey report, it was "still unclear what, if any, accommodations [he was] requesting under the purview of the ADA, aside from" not being required to climb a ladder and having lifting restrictions. (Doc. # 28-11.)  Mr. Johnson concluded by asking Mr. Chesser to obtain certification from his physician of his "impairment and accommodation" if he was seeking accommodations other than not climbing a ladder and lifting restrictions. (Doc. # 28-11.)  He explained that the doctor certification is necessary because the September 2010 doctor's letter did not address his specific job functions, accommodations that would allow performance of job functions, or how long accommodations would be required.

On June 4, 2012, Mr. Chesser's summer furlough began.  MCAA notified Mr. Chesser of the summer furlough on May 24, 2012 by internal memorandum.  The memorandum indicated that the annual summer schedule for the support service division had been set in light of the conclusion of the Head Start Program's annual term.  Mr. Chesser, as well as three black MCAA employees within his department, participated in the 2012 summer furlough.[11]  During the time that Mr. Chesser was

---

[11] Mr. Chesser also participated in a furlough in the summer of 2009 and 2010, as well as in the summer of 2013.

furloughed, a black fellow coordinator was tasked with performing the supply coordinator tasks that continued into the summer, for which she was compensated with overtime pay as necessary.

While he was on furlough, Mr. Chesser emailed Mr. Johnson with an updated letter from his physician describing the tasks that he would be unable to perform[12] and explaining that his physician would prepare information on reasonable accommodations "at the doctor's earliest convenience."   (Doc. # 28-12.) Approximately three weeks later, on July 13, 2012, Mr. Chesser emailed Mr. Johnson to provide a formal notice that he intended to lodge a complaint with the EEOC "based upon the discriminatory manner in which [he] had been treated, related to [his] disability."  (Doc. # 34-1, Ex. 14.)  To substantiate his claim of discrimination, he informed Mr. Johnson that he had repeatedly provided letters from his physician, did not receive any response from his most recent June email, was made the subject of disparaging comments by Mr. Standberry,[13] and was forced to take an unpaid summer furlough.

---

[12] The new doctor's letter, dated June 21, 2012, varied from the September 2010 letter in one respect.  It added a sentence, explaining that Mr. Chesser's "injuries are permanent and physical abilities are not expected to be improved."  (Doc. # 28-12.)

[13] During a meeting of the support services division, Mr. Standberry told Mr. Chesser to "get out of the way, that [he] wasn't doing anything, anyway."  (Doc. # 28-2, at 105.)

Mr. Gardner responded to Mr. Chesser's email by letter on August 2, 2012. In the letter, Mr. Gardner confirmed that MCAA had received Mr. Chesser's June email and accompanying doctor's letter, but noted that the email had suggested that information regarding appropriate accommodations was still forthcoming from his doctor. He asked that Mr. Chesser continue to work with his physician to get that information to MCAA by August 15, 2012, so that the agency could have the time to make arrangements prior to Mr. Chesser's return from summer furlough on August 27, 2012. Mr. Gardner also addressed Mr. Chesser's other concerns regarding previous denials of accommodation requests, disclosures of his physical limitations to co-workers, and Mr. Standberry's comment by requesting that Mr. Chesser provide him with details regarding these events. Mr. Gardner suggested that the two schedule a time to meet to speak further about these concerns.[14]

Mr. Chesser returned to work on August 27, 2012.[15] Despite MCAA's repeated requests,[16] Mr. Chesser did not submit the requested accommodation

---

[14] Mr. Chesser's attorney responded to Mr. Gardner's letter and informed Mr. Gardner that all future communication should be directed to his office and that the items requested would be provided by August 15, 2012.

[15] When Mr. Chesser returned from his furlough, he was the only employee to experience a one-week delay in receiving the key to his company car. Mr. Chesser notes that Mr. Standberry indicated that the delay occurred because MCAA had not received information regarding Mr. Chesser's accommodations. However, Mr. Johnson indicated that the delay was the result of Mr. Chesser's failing to bring him proof of having paid a parking ticket he received while driving an MCAA vehicle the previous school year.

[16] On August 24, 2012, an attorney for MCAA sent a letter to Mr. Chesser's attorney informing him that MCAA had yet to receive the accommodations information requested form Mr.

information from his doctor until September 13, 2012.  The new letter from Mr. Chesser's doctor indicated that Mr. Chesser's physical impairments left him unable to count items on shelves above or below eye level, move boxes, climb a ladder, or stand, sit, or walk for extended periods of time.  As to accommodations, the letter noted that such tasks could be "accomplished under Mr. Chesser's supervision by someone else."  (Doc. # 34-1, Ex. 13.)

Mr. Chesser still works as MCAA's supply coordinator.  To date, his pay has not been altered.  He has, however, experienced a change in responsibilities.  Since September 13, 2012, Mr. Chesser has not been responsible for unloading boxes,[17] taking warehouse inventory, or ordering inventory from vendors.  Instead, Mr. Chesser is responsible for going to MCAA's various Head Start centers examining which supplies they need, completing a requisition form, and giving the requisition form to the delivery men, who then load the supplies and take them to the corresponding center.

### 3.    *EEOC Charge*

---

Chesser's doctor despite his attorney's earlier commitment to have the information submitted by August 15, 2012.   The letter reminded Mr. Chesser's attorney of the importance of the accommodation information with regard to Mr. Chesser's upcoming return to work.

[17] On September 6, 2012, Mr. Chesser was injured lifting a case of paper towels when tasked with loading and delivering supplies to one of the Head Start centers.  Mr. Chesser, however, does not remember if he asked for help that day when he realized the items were beyond his limits.

Mr. Chesser's first EEOC charge, filed on July 16, 2012, alleged retaliation, disability discrimination, and hostile work environment.  On January 22, 2013, Mr. Chesser amended his EEOC charge to add a claim of racial discrimination and to reallege the continuing retaliation and disability discrimination on the part of MCAA.  On March 18, 2013, Lashuanda Love, the EEOC employee assigned to investigate Mr. Chesser's charges, contacted Mr. Chesser through his attorney to inform him that MCAA had responded to his allegations and that the EEOC would need additional information in order to fully investigate his claims.  On April 4, 2013, Mr. Chesser's attorney replied to Ms. Love and communicated his belief that Mr. Chesser had "adequately provided supporting documentation and evidence for consideration in support of the allegations" and inquired as to when the right-to-sue letter would be issued.  (Doc. # 34-2.)

The EEOC concluded its investigation and issued a right-to-sue letter to Mr. Chesser and his attorney on April 9, 2013.  Neither Mr. Chesser nor his attorney received the initial letter, however.[18]  On April 16, 2013, an assistant of Mr. Chesser's attorney spoke with a member of the EEOC and learned that the initial right-to-sue letter had been sent to a prior mailing address.  The assistant then requested that an additional copy of the letter be sent to the firm's new mailing

---

[18] Mr. Chesser's attorney explained that he did not receive the original right-to-sue letter because it was sent to his law firm's previous mailing address, but Mr. Chesser offered no explanation as to why he himself did not receive a copy of the original letter.

address.  On April 22, 2013, Mr. Chesser's attorney finally received a copy of his client's right-to-sue letter, and the next day he provided a copy to Mr. Chesser.

**B.    Procedural History**

Mr. Chesser filed his lawsuit on July 18, 2013, in the District Court for the Northern District of Alabama.  In his amended complaint, Mr. Chesser brings claims for violations of Title VII and the Americans with Disabilities Act ("ADA").  Specifically, he alleges that MCAA discriminated against him based on his disability and race, retaliated against him based on his disability, and caused him to suffer mental and emotional distress.  On September 12, 2013, MCAA filed a motion to dismiss or, in the alternative, a motion to transfer venue.  Two weeks later the parties jointly filed a motion to transfer venue to the District Court for the Middle District of Alabama, which the court granted on December 11, 2013.  MCAA now moves for summary judgment as to all of Mr. Chesser's claims.

## IV.  DISCUSSION

**A.    Mr. Chesser's Title VII and ADA Claims**

MCAA begins its brief in support of summary judgment by arguing that most of Mr. Chesser's claims are statutorily time-barred because Mr. Chesser failed to file his lawsuit within ninety days of receiving his right-to-sue letter from the EEOC.  A plaintiff seeking relief under Title VII, as well as the ADA, must file his lawsuit

within ninety days of receiving a right-to-sue letter. *See* 42 U.S.C. § 2000e-5(f)(1); *see also Green v. Union Foundry Co.*, 281 F.3d 1229, 1233 (11th Cir. 2002); *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964.") *Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 524 (11th Cir. 1991) (Title VII "requires that suit be brought within 90 days after receipt of notice of right to sue."). Thus, if the complaint is not filed within ninety days, Mr. Chesser's claims are due to be dismissed. Under § 2000e-5(f)(1), the ninety-day period begins to run from "the giving" of the notice of a right to sue. Accordingly, it is the *receipt* of the notice that triggers the commencement of the ninety-day filing period. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973). If the date of receipt is unclear, however, the Eleventh Circuit places the burden of proof on the plaintiff to establish that his lawsuit is timely. *See Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) ("Once a defendant contests the issue of whether the complaint was timely filed, the plaintiffs bear the burden of showing that they have met the requirement.").

Mr. Chesser filed his complaint on July 18, 2013, 100 days after the date on his right-to-sue letter, which is dated April 9, 2013. Mr. Chesser's claim, however, is not untimely based on this fact alone, because it is the date he received his right-to-sue letter that controls. Mr. Chesser's right-to-sue letter was addressed to his

attorney, not to Mr. Chesser directly, and Mr. Chesser's attorney argues that the ninety-day period did not begin to run until April 23, 2013 (the date Mr. Chesser received the letter) or April 22, 2013 (the date the attorney's office received the letter). Communications in the record indicate that Mr. Chesser's attorney contacted EEOC on April 4, 2013, to inquire as to when Mr. Chesser's right-to-sue letter would be issued.[19]  Then on April 16, 2013, an assistant of Mr. Chesser's attorney exchanged a phone call and email with the EEOC investigator, at which time it was discovered that the right-to-sue letter had been mailed to the law firm's previous address on April 9, 2013.  (Doc. # 34-1, Exs. 2 & 3.)  The assistant requested that a second copy of the right-to-sue letter be sent to the firm's new address.  It arrived on April 22, 2013.

In determining when the ninety-day period should begin to run, the Eleventh Circuit has advised that the key word in § 2000e-5(f)(1) is "notify." *Zillyette*, 179 F.3d at 1339.  Accordingly, "the notification period beings to run upon notification

---

[19] Mr. Chesser's attorney signed-off the email with the following: "Thank you, Ben Cooper." (Doc. 34-1, Ex. 2.)  After the salutation, an automatic signature was added to the email that included the attorney's full name, the name of the law firm, a post office box address, telephone numbers, and a confidentiality notice and disclaimer.  While Mr. Chesser has not argued that the post office box address included in his attorney's automatic email signature equaled a notice of change of address, the court notes that at no point in the email did the attorney inform Ms. Love that the address on file with the EEOC was no longer appropriate.  Moreover, the automatic signature did not indicate that the post office box address was replacing any other law firm address.  Accordingly, the court finds that the EEOC was not made aware of a new address for Mr. Chesser's file until the April 16, 2013 email from the attorney's assistant.  To hold otherwise absent any argument from Mr. Chesser, would place an impractical and inefficient burden on the EEOC.

of the aggrieved party." *Id.* (quoting *Franks v. Bowman Transp. Co.*, 495 F.2d 398, 404 (5th Cir. 1974), *rev'd on other grounds*, 42 U.S. 747 (1976). This means that "notification takes place only when 'notice of the failure to obtain voluntary compliance has been sent *and received*.'" *Id.* (quoting *Franks*, 495 F.2d at 404). The Eleventh Circuit, however, "has refused to establish an inflexible rule [for] determining when a complainant" has actually received notice, opting instead for a case-by-case approach. *Bell v. Eagle Motor Lines*, 693, F.2d 1086, 1087 (11th Cir. 1982). A case-by-case analysis should balance the "liberal construction the act is entitled to . . . fashion a fair and reasonable rule" while not entitling a plaintiff to "open ended-time extension[s] which could render the statutory limitation meaningless." *Id.* Ultimately, a "plaintiff should be required to assume some minimum responsibility . . . for an orderly and expeditious resolution of his dispute." *Id.* Applying this principle, courts have looked to whether a plaintiff's own actions led to a failure to receive the notice-of-right to sue letter, or alternatively, whether the letter was not received through events beyond a plaintiff's control. *See Zillyette*, 179 F.3d at 1339–40 (citing *Franks*, 495 F.2d at 405); *Lewis v. Conners Steel Co.*, 673 F.2d 1240, 1243 (11th Cir. 1982).

Here, the court must determine when Mr. Chesser's attorney *received* the right-to-sue letter. *See Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990) (holding that a right-to-sue letter was deemed received when it arrived at the office

21

of the complainant's attorney); *Decker v. Anheuser-Busch*, 632 F.2d 1221, 1223–24 (5th Cir. 1980) (holding that "notice to an attorney who is formally representing the complainant in an EEOC proceeding, constitutes notice to the complainant and begins the running of the 90 days allowed for the filing of suit").  This requires an examination into whether Mr. Chesser's attorney should be deemed to have *received* the first right-to-sue letter when it was delivered to his firm's previous address.  As MCAA highlighted, the Eleventh Circuit's analysis in *Lewis v. Conners Steel Co.* is helpful on this point.  673 F.2d 1240 (11th Cir. 1982).  In that case, the court held that it was "fair and reasonable for the plaintiff . . . to assume the burden of advising the EEOC of address changes or to take other reasonable steps to ensure delivery of the notice to his current address."  *Id.* at 1243.  Moreover, "if [the plaintiff] did not contribute that minimum assistance to the process, he should not be heard to complain that he did not receive the letter delivered to the last address known to the EEOC" unless he could show that the failure was instead purely the result of circumstances beyond his control.  *Id*. (remanding the case so that the district court could determine whether the plaintiff had in fact performed the "minimum assistance" necessary of updating the EEOC of his address change).

More recently, the Eleventh Circuit applied these principles to determine that two plaintiffs in a class-action age discrimination case were time-barred from bringing Title VII claims because their complaints were filed outside the ninety-day

right-to-sue window.  *Kerr,* 427 F.3d at 948–49.  In *Kerr*, the plaintiffs had orally requested their right-to-sue letters upon finding out that the EEOC was concluding its investigations into their cases.  *Id.* at 949.  Each plaintiff then followed up the oral requests with written confirmation of their desire for a right-to-sue letter.  *Id.* at 949–50.  Despite these efforts, both plaintiffs claimed that they did not receive right-to-sue letters until mid-February 2012 – after the second mailing of the letters and more than one month after the original letters were mailed.

Rather than deem the date of receipt to be in mid-February, however, the Eleventh Circuit determined that both plaintiffs knew that right-to-sue letters would be mailed as early as January 3, 2012, and, accordingly, the date of receipt was not material to the summary judgment analysis as both plaintiffs had "adequate prior notice [of the right-to-sue letters] prior to actual receipt."  *Id*. at 952; *see also Santini v. Cleveland Clinic Fla.*, 232 F.3d. 823, 825 (11th Cir. 2000) (explaining that "receipt of a second EEOC Notice does not constitute grounds for equitable tolling where a party has actual knowledge of the first Notice").  As a result, the court added three days to the date the right-to-sue letters were mailed and deemed them received as of January 12, 2003.  *Kerr*, 427 F.3d at 953 (explaining that allowing the plaintiffs to deny knowledge of the whereabouts of the original letters and claim receipt one month later would allow the plaintiffs to benefit from "the kind of manipulable open-

ended time extension which has caused [the court] concern in the past") (internal quotations omitted).

In responding to MCAA's motion for summary judgment and expressly arguing that his complaint is not time-barred, Mr. Chesser does not in any way address *Lewis*.  Rather, Mr. Chesser holds fastidiously to *Franks v. Bowman*'s bright line "actual receipt" rule and barely glosses over the minimum responsibility of a plaintiff to ensure that the EEOC has a correct address on file.  In fact, in his brief, Mr. Chesser does not even attempt to address why neither he nor his attorney received the first right-to-sue letter, instead merely acknowledging that "[o]n April 9, 2013, the EEOC issued a Notice of Rights not received by either Plaintiff or his counsel."  (Doc. # 34, at 6.)

Had Mr. Chesser's attorney updated the EEOC regarding his firm's change of mailing address, it is reasonable to conclude that he would have received Mr. Chesser's right-to-sue letter by April 13, 2013.  *See Belue v.Oliver*, No. 3:12-cv-3461, 2013 U.S. Dist. LEXIS 27441, at *5 (N.D. Ala. Feb. 28, 2013) (applying "a presumption of three days for receipt by mail, akin to the time period established in Fed. R. Civ. P. 6(e)") (citing *Kerr*, 427 F.3d at 953).  Additionally, even overlooking this neglect, Mr. Chesser's attorney received actual knowledge of the issuing of the first right-to-sue letter on April 16, 2013, when his assistant spoke with the EEOC.

Under both scenarios, Mr. Chesser's complaint was filed outside the ninety-day period.

Moreover, when Mr. Chesser's attorney acknowledged the arrival of the second right-to-sue letter on April 22, 2013, he still had more than two months during which he could have filed his lawsuit and avoided the entire limitations issue. Instead, despite having notice of the mailing of the first letter to his law firm's old address as early as April 16, 2013, he filed his suit on July 18, 2013, and forced the timeliness issue unnecessarily.  (Doc. # 34-1, Ex. 3) ("Per our phone conversation of even date, I am requesting an additional copy of Mr. Anthony Chesser's Right To Sue letter, charge number above, be sent to our firm.  It is my understanding that the original letter was sent on 4/9/13 to our old address.").

Ultimately, Mr. Chesser has not met his burden of showing that his lawsuit is timely.  *Kerr,* 427 F.3d at 951 ("Once a defendant contests the issue of whether the complaint was timely filed, the plaintiffs bear the burden of showing that they have met the requirement.").  Mr. Chesser failed to keep the EEOC informed of an appropriate mailing address and failed to file suit within ninety days of receiving actual knowledge of the mailing of the first right-to-sue letter to his attorney's

previous address.  Accordingly, MCAA's motion for summary judgment is due to be granted as to Mr. Chesser's Title VII and ADA claims.[20]

## B.    Mr. Chesser's Claim for Mental and Emotional Distress

Mr. Chesser's remaining claim is for mental and emotional distress.  While not specifically worded as a state-law claim, Count IV for mental and emotional distress is construed as an Alabama state-law claim pursuant to the tort of outrage. *See Camp v. Corr. Med. Servs., Inc.*, 668 F. Supp. 2d. 1338, 1364 (M.D. Ala. 2009) ("According to the Alabama Supreme Court, 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.'") (quoting *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)). Because the court has granted summary judgment over all claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction over plaintiff's state-law claim.  28 U.S.C. § 1367(c)(3).  The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004); *see also Maughon v. City of Covington*, 505 F.

---

[20] While the court is hesitant to find against Mr. Chesser for failing to file suit within the statutorily prescribed ninety-day window, it is not permitted to overlook the rules prescribed by Congress or Circuit precedent. Further, were the court to look past Mr. Chesser's oversight in failing to adhere to § 2000e-5(f)(1)'s procedural requirements and address the merits of his Title VII and ADA claims, the court would again find against Mr. Chesser, as MCAA has shown that it would be entitled to judgment as a matter of law on the merits.

App'x 818, 823 (11th Cir. 2013) (finding no abuse of discretion in district court's declining to exercise supplemental jurisdiction over Mr. Chesser's state-law claim after it had granted summary judgment on all of the federal claims).

Accordingly, because MCAA's motion for summary judgment is granted as to all of Mr. Chesser's federal-law claims, the court declines to exercise supplemental jurisdiction over Mr. Chesser's state law claim.

## V.  CONCLUSION

Based on the foregoing analysis, it is ORDERED that MCAA's motion for summary judgment (Doc. # 27) is GRANTED as to Mr. Chesser's Title VII and ADA claims.  Further, it is ORDERED that Plaintiff's state-law claim for the tort of outrage is DISMISSED without prejudice.

A separate final judgment will be entered.

DONE this 22nd day of January, 2015.

_____ /s/ W. Keith Watkins _____
CHIEF UNITED STATES DISTRICT JUDGE